**BUSCAGLIA, Treasurer of Puerto Rico, et al. v. DISTRICT COURT OF SAN JUAN et al.**

No. 4022.

Circuit Court of Appeals, First Circuit.

Oct. 24, 1944.

Writ of Certiorari Denied Jan. 2, 1945.
See 65 S.Ct. 434.

276

David L. Kreeger, and Irwin W. Silverman, both of Washington, D. C., E. Campos del Toro, of San Juan, Puerto Rico, E. Ramon Antonini, of Ponce, Puerto Rico, and Victor Gutierrez Franqui, of San Juan, Puerto Rico, for appellants.

F. Fernandez Cuyar, of San Juan, Puerto Rico, for Celestino Iriarte, appellee.

Before MAGRUDER, MAHONEY and WOODBURY, Circuit Judges.

WOODBURY, Circuit Judge.

This is a suit by a Puerto Rico taxpayer to enjoin certain Puerto Rican officials from making any further allocation of insular funds for emergency relief purposes on the ground that no valid legislative appropriation exists therefor. The case comes to us on appeal by the defendants from an order of the Supreme Court of Puerto Rico entered on July 28, 1944, annulling a writ of certiorari previously issued by that court, restoring in all its force and effect a restraining order issued on July 12, 1944, by the District Court of the Judicial District of San Juan, and remanding the case to the latter court for further consistent proceedings.

To understand the questions of law before us on this appeal the facts and pleadings must be stated in considerable detail.

On November 27, 1942, the Governor of Puerto Rico approved Act No. 16 of the Insular Legislature of that year. Laws of Puerto Rico, Second and Third Special Sessions, 1942, p. 52 et seq. In this bill the Legislature declared that because of the war there existed in the island "a state of grave emergency" "characterized by a huge increase in unemployment, and a great scarcity and an extraordinary increase in the prices of subsistence staples," and that in consequence "A serious threat of starvation and despair now hovers over our people." To meet this emergency it created an Insular Emergency Council composed of the Governor of Puerto Rico as president and the heads of the eight departments of the Puerto Rican government as members, and gave to this council comprehensive powers including, among others, the power to inaugurate "an ample emergency work program through which employment will be provided to the largest possible number of unemployed persons in the towns and fields of Puerto Rico," and the power to inaugurate "unemployment compensation projects to provide subsistence relief for those unemployed persons to whom no work can be offered at the moment, or who cannot obtain same because of illness, physical disability, or any other justified cause." In § 14 the Legislature provided: "To carry out the pur-

poses of this Act, the sum of ten million (10,000,000) dollars is hereby appropriated out of any funds in the Treasury of Puerto Rico not otherwise appropriated, plus seventy (70) per cent of the revenues of the Insular Treasury from the proceeds of the Federal Internal-Revenue Tax on distilled spirits shipped or which may be shipped from Puerto Rico to the United States from and after November 1, 1942," and it allocated this appropriation in specific amounts to the various phases of its relief program. In conclusion the legislature provided that the act, "being of an urgent and necessary character," should take effect immediately upon its approval, and that it should continue in effect until either the Governor, or the Insular Legislature by concurrent resolution, should declare that the state of emergency had ended.

Some six months after the passage of this Act, specifically on May 15, 1943, the Governor of Puerto Rico approved Act No. 181 of that year, Laws of Puerto Rico, 1943, p. 654, which amended, inter alia, § 14 of Act No. 16 of the previous year to read as follows: "To carry out the purposes of this Act, the sum of sixteen million (16,000,000) dollars, or such part thereof as may be necessary in any fiscal year, in the judgment of the Insular Emergency Council, is hereby appropriated out of any funds in the treasury of Puerto Rico, not otherwise appropriated; Provided, That of the total amount of this appropriation, the sum of four million (4,000,000) dollars shall not be available until July 1, 1943." [1] In this amendment, as in the original section, funds were specifically allocated and the amendment was made retroactive to the effective date of Act No. 16, "Provided, That any amount which has been set up on the appropriation books in accordance with said Act No. 16, approved November 27, 1942, shall be considered as part of the total amount appropriated by this Act."

Approximately a year later, (during February and March, 1944), bills to appropriate further sums for the use of the Emergency Council were introduced in each house of the Puerto Rican Legislature, but neither house would concur in the other's bill and in consequence no appropriation was made before the Legislature adjourned.

This was the state of affairs on June 29, 1944, when the plaintiff, Celestino Iriarte Miro, alleging that he is a citizen of Puerto Rico and of the United States, a voter in Puerto Rico, and an owner of real and personal property situated there who pays regular and special taxes assessed thereon into the insular treasury, filed a verified petition in the District Court of the Judicial District of San Juan for an injunction against the insular treasurer and the insular auditor in their respective official capacities and against them and the other members of the Insular Emergency Council in their official capacities as such. In this petition the plaintiff alleges the passage of Act No. 16 of 1942, its amendment by Act No. 181 of 1943, and the failure of the Puerto Rican Legislature to agree during February and March 1944 on any bill making further appropriations to carry on the work of the Insular Emergency Council. The petition then continues as follows:

"7. The plaintiff further alleges that the sum of $16,000,000 appropriated by Act No. 16 of 1942, as amended by Act No. 181 of 1943, is already totally exhausted, the Insular Emergency Council having disposed of the total amount for projects and expenses, so that from July 1, 1944,[2] the Insular Emergency Council will not have at its disposal any money coming from the said sum of $16,000,000.

"8. The plaintiff further alleges that the Insular Emergency Council and the Treasurer and the Auditor of Puerto Rico intend, propose, and are going to utilize the additional sum of $16,000,000 from the regular funds of the Treasury of Puerto Rico, which sum is to be placed at the disposal of the Insular Emergency Council to be expended from and after July 1, 1944, for the ends and purposes determined by Act No. 16 of 1942, as amended, this in spite of the fact that there exists no legislative appropriation of said additional sum of $16,000,000 and in spite of the fact that the Legislature of Puerto Rico twice

---

[1] We are told that the reason for this amendment was that shortage of distilled spirits in continental United States had so increased the demand for Puerto Rican rum that 70% of the income from the internal revenue tax thereon was far more than sufficient to meet the cost of relief.

[2] In Puerto Rico fiscal years run from July 1 of each calendar year through June 30 of the calendar year following.

refused to appropriate any additional funds for the ends or purposes enumerated in Act No. 16 of 1942."

Then the plaintiff alleges that "such allotment or appropriation of public funds * * * is illegal and contrary to the Organic Act of Puerto Rico," that "the additional sum of $16,000,000 which the defendants thus seek to allot, appropriate, and utilize for purposes of the Insular Emergency Council, shall be taken from the regular funds of the Treasury of Puerto Rico, said funds having been raised for the public treasury through the levying and collection of regular and special taxes on the plaintiff and other taxpayers of Puerto Rico," that the "illegal use of said sum of $16,000,000 will cause irreparable damages to all taxpayers in Puerto Rico in general, and to the plaintiff in particular as a taxpayer, since all will have to contribute new taxes to cover the deficiency created by the illegal use of said funds" and finally that "in order to prevent the illegal, extravagant, and unconstitutional utilization or appropriation of public funds aforesaid, he has no other adequate, rapid, and efficacious relief than that of the injunction here requested."

The relief asked for is threefold: First, the plaintiff asks for a permanent injunction to restrain the defendants in their official capacities, either by themselves or through their subordinates, from making "any allotment, appropriation, or use whatsoever of any item of money from the regular funds of the Insular Treasury of Puerto Rico or from any other funds of the insular treasury, in order to place same at the disposal of the Insular Emergency Council for the ends and purposes stated in Act No. 16 of 1942, as amended by Act No. 181 of 1943." Next he asks for a "preliminary injunction containing the prohibitions aforesaid," to continue in effect "until the permanent injunction requested has been tried and decided," and finally he "requests that, pending the hearing of the request for injunction pendente lite" the court, upon the filing of a bond, issue "a restraining order containing the said prohibitions * * * in order to maintain the status quo" until the court "takes cognizance of the request for preliminary injunction, weighs the merits of the present relief, and renders the pertinent decision."

The Insular District Court did not give the plaintiff the instantaneous ex parte relief for which he asked, but instead, immediately upon the filing of the petition, ordered that notice thereof be served on the defendants and that they be summoned to appear on July 7, 1944, at 9 a. m. "to show cause, if any there be, why this court should not order the issuance of the preliminary writ of injunction requested." At the same time the district court ordered the parties to "come prepared to show to the court the legal basis, or lack of legal basis, for issuing immediately a restraining order, such as requested by the plaintiff, in the event that the court should reserve its decision as to the preliminary writ of injunction requested." On the day set the defendants appeared and filed an answer to the order to show cause in which they admitted the facts alleged, including the facts set out in paragraphs 7 and 8 of the petition quoted above, but asserted that their proposal to take an additional sum of $16,000,000 from regular funds in the treasury "for the ends and purposes determined by Act No. 16 of 1942, as amended," was "legal and constitutional," that is, that the action they proposed to take was not only sanctioned by § 14 of the above Act, as amended, but also by a provision of § 34 of the Organic Act of Puerto Rico which we shall consider hereafter. In addition as special defenses they alleged that the plaintiff as a taxpayer had no standing to maintain his petition; that the district court lacked jurisdiction to grant the relief requested, and that "the principles of equity militate against the issuance of the writ of injunction" for the broad reason that, if issued, the harm which it would do to the public in general and to persons on relief in particular would be wholly out of proportion to the benefit which it would confer upon the plaintiff and other taxpayers in his situation.

At the same time counsel representing individual beneficiaries under the relief program and three municipalities in which work projects were under way, appeared and asked leave to intervene. There being no objection, they were admitted as interveners-defendants opposed to the plaintiff's petition. For the purposes of this appeal the answer filed on their behalf is similar to the answer filed by the defendants.

At a pre-trial conference all questions of fact were admitted except the question whether on balancing the equities the injunction asked for ought to be granted,

and the court then stated: "What is set for hearing today is an injunction pendente lite and whether or not an injunction is in order. So, that evidence would be for the purpose of the provisional injunction and to see whether or not such injunction pendente lite is in order. We are not hearing the definitive injunction. * * * The provisional injunction only." Evidence was thereupon introduced by the defendants and the interveners to show that if this injunction should be issued, the harm which it would do to the people of Puerto Rico, particularly those on relief, and to the municipalities where public works were in progress and incomplete would greatly outweigh any possible benefit which it would confer upon the plaintiff and his fellow taxpayers. At its conclusion the following colloquy took place: .

"Mr. Campos del Toro: (counsel for the defendants) We request that a final decision be given; we submit the case to judgment.

"The Court: The permanent injunction?

"Mr. Campos: In order not to trouble the court any further and to save time, I believe that if we came back here again, we should repeat the same evidence; we have no more evidence, and the best thing is to submit it to your Honor so that, instead of making two separate studies, you will have to make only one.

\* \* \* \* \* \*

"Mr. Ramos Antonini: (counsel for the interveners) We have no objection whatever to submitting the preliminary injunction on the same proof that has already been offered. Our only reservation is our doubt as to whether your Honor can hand down a decision on this matter while the court is in recess. If your Honor comes to the conclusion that he can do so, we have no objection whatever.

\* \* \* \* \* \*

"The Court: If the parties agree, if the court comes to the conclusion that it can issue a permanent injunction, it will do so, and if it comes to the conclusion that it can issue only a preliminary injunction, it will leave the permanent injunction for some future hearing.

"Mr. Fernandez Cuyar: (counsel for the plaintiff). In regard to that, I am willing to stipulate that whatever decision your Honor makes shall be considered valid in that respect. I waive any possible objection to your passing final judgment.

"Mr. Campos del Toro: We have no objection.

"Mr. Ramos Antonini: We oppose this and we are going to the extreme of believing that if we are right this is a question of jurisdiction, but we are not going to place emphasis on this problem."

Thereupon, on July 12, 1944, the district court entered what it called a "Restraining Order" in which it is recited that when the plaintiff's petition was filed the court "was of opinion that it was unwise" to issue immediately the ex parte restraining order requested and so entered the order of notice quoted supra; that the parties, according to their own statements, had introduced all their evidence and in addition "had argued extensively before the court on the 7th, 10th and 11th of July"; that "after hearing the evidence adduced and the oral arguments of all the parties, this court believes prima facie that the petitioner is right" "that public funds, in large amounts, are being disbursed illegally and in violation of paragraph 21, Section 2 of the Organic Act of Puerto Rico [48 U.S.C.A. § 837]"; that if such disbursement continues the plaintiff, the taxpayers and the people of Puerto Rico as a whole will suffer irreparable damage; that it (the court) will at once devote itself exclusively to the study of the case and will render judgment, provided it has jurisdiction to enter judgment during recess, within the next ten or twelve days; and that "the balance of conveniences, as shown by the evidence submitted and by the oral reports of the parties, is in favor of protecting, during said short period, the funds of the public treasury belonging to the People of Puerto Rico". The court then issued a restraining order, conditioned upon the plaintiff's filing a bond, in the terms requested, but with the proviso that "Once this order becomes effective, the same will be in force solely and exclusively until this court enters an order or renders judgment herein in connection with the preliminary writ of injunction prayed for or in connection with the permanent injunction requested, provided this court decides that it has jurisdiction to enter a final judgment with regard to the petition for a permanent injunction."

At this point and without waiting for the district court to consider the case any fur-

ther the defendants, proceeding under Act No. 32 of 1943 [3] (Laws of Puerto Rico 1943, pp. 84, 85), filed a petition for certiorari in the Supreme Court of Puerto Rico. That court ordered the issuance of the writ "in order that this court may review the restraining order issued under date of July 12, 1944, in the said case and decide same in accordance with law" and set the hearing for July 14. It also ordered the restraining order of the district court suspended "until this court may have an opportunity to hear the parties and to decide the question on its merits."

On July 28, 1944, the Supreme Court of Puerto Rico handed down its opinion in this case which it prefaces with the statement that "This is perhaps one of the most important cases ever submitted" to it for decision, and that "It involves serious social problems and legal questions which are intimately related." Then it states the facts and pleadings which we have already summarized, and proceeds to consider and decide what it calls "the three fundamental questions involved in this suit," which it states as follows:

"First: Does taxpayer Celestino Iriarte Miro have some special interest of such a nature as to qualify him to bring the proceedings for injunction, for which he has applied in the present case?

"Second: Is Act No. 16 of November 27, 1942, as amended by Act No. 181 of May 15, 1943, an appropriation act which is continuous and self-renewing in the sense that whenever the sum of $16,000,000 appropriated by Section 14 to carry out the purposes of the Act is exhausted, another sum in the same amount becomes available?

"Third: Was the sixteen million dollar appropriation for the emergency program automatically renewed, by virtue of the provisions of Section 34 of the Organic Act, at the expiration of the fiscal year 1943–1944, on June 30, 1944, because the Legislative Assembly failed to make the necessary appropriations for the support of the Government?"

It answered the first question in the affirmative and the second and third in the negative and then entered the following order:

"For the reasons stated in the foregoing opinion, the writ of certiorari issued is hereby annulled, as well as the order of this court dated July 13, 1944, staying the effect of the restraining order entered by the District Court of San Juan, the said restraining order being restored in all its force and effect, and the case is remanded to said court for further proceedings not inconsistent with this opinion."

The defendants then immediately took this appeal to us and at the same time moved that pending our disposition thereof the order of the Supreme Court of Puerto Rico be stayed and suspended. After hearing on August 5 we ordered all proceedings under the order of the Supreme Court of Puerto Rico stayed until our further order, and we heard the case on the merits at a special sitting on August 23.

We are confronted at the threshold with the question of our jurisdiction to entertain this appeal under § 128 of the Judicial Code, 28 U.S.C.A. § 225, which limits our appellate jurisdiction over the Supreme Court of Puerto Rico to "final decisions" of that court in all cases wherein there is the requisite amount in controversy, or "wherein the Constitution or a statute or treaty of the United States or any authority exercised thereunder is involved." Clearly an exercise of authority under a statute of the United States (§ 34 of the Organic Act of Puerto Rico, 39 Stat. 961, 48 U.S.C.A. §. 822 et seq.) is here involved, but is the decision of the Supreme Court of Puerto Rico in the case at bar "final"?

In answering this question we find little help from past decisions of this court because an even comparable factual situation does not appear to have ever before been presented. However, this court has held that the words "final decisions" in the above section of the Code are the equivalent of the words "final judgment or decree" used in § 237 of the Judicial Code,

---

[3] "Section 671-A. Notwithstanding the provisions of Section 670, the Supreme Court of Puerto Rico in its discretion may issue a writ of certiorari to review an order or sentence of a district court when the public interest will be promoted by prompt settlement of the question presented for review. This method of review shall apply both to questions \ of adjective law and to questions of substantive law. The writ may be issued notwithstanding the fact that the order or sentence involved is reviewable on appeal to the Supreme Court in ordinary course, and may be issued at any stage of the proceedings, either before or after final judgment in the district court."

28 U.S.C.A. § 344—the section giving the Supreme Court of the United States jurisdiction, under certain circumstances, to review decisions of the highest state courts, Rubert Hermanos, Inc., v. People of Puerto Rico, 1 Cir., 118 F.2d 752, 757, reversed on other grounds 315 U.S. 637, 62 S.Ct. 771, 86 L.Ed. 1081; Cosme v. Marquez, 1 Cir., 94 F.2d 908, 910, and cases cited, and from this it follows that decisions of the Supreme Court construing this latter section are good authorities for us in construing the former one. We turn therefore to the numerous decisions of the Supreme Court of the United States on the question of what state court judgments are and what are not final for the purpose of review.

■ The obvious purpose of both statutory provisions is to prevent piecemeal review through the medium of successive appeals (Martinez v. International Banking Corp., 220 U.S. 214, 223, 224, 31 S.Ct. 408, 55 L.Ed. 438; Louisiana Navigation Co. v. Oyster Commission, 226 U.S. 99, 101, 33 S.Ct. 78, 57 L.Ed. 138) and to effectuate this purpose the Supreme Court has frequently intimated that it would determine finality by looking only to the face of the record and the formal character of the judgment rendered. Bruce v. Tobin, 245 U.S. 18, 19, 38 S.Ct. 7, 62 L.Ed. 123, and see also the cases cited in the dissenting opinion filed in Clark v. Williard, 292 U. S. 112, 129 et seq., 54 S.Ct. 615, 78 L.Ed. 1160. But the Supreme Court has applied this rule literally only when it was "appropriate to the condition presented" (Carondelet, etc., Co. v. State of Louisiana, 233 U.S. 362, 372, 34 S.Ct. 627, 629, 58 L. Ed. 1001), that is, when an inspection of the judgment alone clearly showed whether it was or was not "final." Thus in Board of Commissioners of Tippecanoe County v. Lucas, 93 U.S. 108, 113, 23 L.Ed. 822, a case in which the highest state court had reversed an order granting a temporary injunction and had remanded with instructions to dismiss the complaint, the Supreme Court, in spite of the form of the judgment, found the finality requisite to sustain its jurisdiction on the ground that entry of judgment by the trial court was a mere ministerial act. However, the court suggested an even broader ground by saying: "If, by any direction, the entire cause is, in fact, determined, the decision, when reduced to form and entered in the records of the court, constitutes a final judgment, subject in a proper case to our review, whatever may be its technical designation." See also Mower v. Fletcher, 114 U.S. 127, 5 S.Ct. 799, 29 L.Ed. 117. Then later, in Metropolitan Water Co. v. Kaw Valley District, 223 U.S. 519, 523, 32 S.Ct. 246, 56 L.Ed. 533, the Supreme Court dispensed with the requirement that the direction to enter a specified judgment be expressed in the mandate itself by holding that a direction to the trial court to proceed consistently with the opinion operates to make the opinion part of the mandate as completely as though set out at length. See also Gulf Refining Co. v. United States, 269 U.S. 125, 135, 136, 46 S.Ct. 52, 70 L. Ed. 195, and Clark v. Williard, 292 U.S. 112, 118, 54 S.Ct. 615, 78 L.Ed. 1160. So, we come to the conclusion, regardless of the language sometimes used, that the Supreme Court will take jurisdiction even when the judgment of the highest state court is not final in form provided it clearly appears from the record that the litigation in that court is in fact ended and the rights of the parties on the merits have been fully and finally determined. In other words, as the Supreme Court said in the recent case of Department of Banking v. Pink, 317 U.S. 264, 268, 63 S.Ct. 233, 235, 87 L.Ed. 254, "For the purpose of the finality which is prerequisite to a review in this Court, the test is not whether under local rules of practice the judgment is denominated final[4] (citing cases), but rather whether the record shows that the order of the appellate court has in fact fully adjudicated rights and that that adjudication is not subject to further review by a state court."

We come now to the application of this principle to the situation presented by the case before us.

■ From our resume of the proceedings in the courts below it appears that all questions of fact but one—the question whether on balancing the conveniences the temporary injunction asked for should issue—were admitted before trial in the dis-

[4] In determining finality the Supreme Court will not look to state law or practice except to ascertain the incidents and effects of a particular judgment. Having done this, it will apply its own criteria of finality, not the state court's. Wick v. Superior Court, 278 U.S. 575, 49 S.Ct. 94, 73 L.Ed. 515, and cases cited, Cole v. Violette, 319 U.S. 581, 582, 63 S.Ct. 1204, 87 L.Ed. 1599.

trict court; that evidence on this disputed issue of fact was taken; that at the conclusion thereof the parties submitted their entire case for decision reserving only the question of the district court's jurisdiction during recess to grant the full measure of relief requested; and that that court, believing "prima facie" that the plaintiff's legal position was sound and that the balance of convenience favored protecting the funds in the treasury for a few days, gave him the temporary relief he desired but reserved final determination until time had afforded an opportunity for further study. At this point the Supreme Court of Puerto Rico took the case out of the Insular District Court's hands by writ of certiorari and proceeded to consider it at once. And it, announcing the importance of the case, that it was deciding the merits of the three fundamental questions presented and was considering the only special defenses "worthy of consideration," affirmed the lower court but remanded for further consistent proceedings. Under these circumstances, there being no further evidence to be taken or considered and no change in the issues being possible (see Gulf Refining Co. v. United States, supra), it seems to us that the Supreme Court of Puerto Rico finally terminated the litigation between the parties on the merits, leaving nothing for the district court to do after reading the Supreme Court's opinion but the ministerial act of making its temporary restraining order over into a permanent injunction. See Chesapeake & Potomac Telephone Co. v. Manning, 186 U.S. 238, 22 S.Ct. 881, 46 L.Ed. 1144. That is to say, as we view the opinion of the Supreme Court of Puerto Rico it categorically answers the only substantial questions raised, i. e., the question of the plaintiff's standing to sue, the question of the nature of § 14 of Act No. 16, as amended, (whether it appropriates $16,000,000 once only or $16,000,000 annually for the period of emergency), and the question of the applicability of § 34 of the Organic Act to renew the appropriation automatically year after year while the emergency lasts. To be sure it did not categorically answer the jurisdictional question which puzzled the district court, but, considering the nature of the question and its lack of merit ('the point was not mentioned in the briefs on appeal to the Supreme Court of Puerto Rico and we find nothing in the Puerto Rican Code even hinting that the district court lacks jurisdiction to grant injunctions during its summer recess) it is safe to assume that the Supreme Court of Puerto Rico answered it sub silentio by deciding the case on its merits, considering the question too unimportant to warrant mention.

But the plaintiff contends that the district court decided only that the balance of convenience does not militate against the issuance of a temporary restraining order, so that now it must judicially determine whether or not the balance of convenience militates against the granting of a permanent injunction. We cannot agree.

■■■ We concede that it is a settled rule of equity that an injunction, particularly an interlocutory or a temporary one, will not be granted when it appears upon "balancing the conveniences" that the harm which such relief will do to the defendant or to the public far outweighs the benefit it will confer upon the plaintiff. Colloquially expressed: Equity will not sanction a cure which is worse than the disease. For authorities see 28 Am.Jur., Injunctions, § 54. But there are definite and well recognized limitations to the rule, particularly as applied to permanent injunctions, one of them being that it does not apply when the plaintiff has clearly and definitely established his right to an injunction and has no other remedy. 28 Am.Jur. supra § 55. That is to say, equity will not leave one who has a clear right without any remedy at all. This limitation applies here. The Supreme Court of Puerto Rico decided that the plaintiff had a clear right to the injunctive relief for which he asked, and clearly he has no other. So we conclude that upon remand the district court would have no question of relative convenience to consider.

■ As we pointed out in Rubert Hermanos, Inc., v. People of Puerto Rico, 1 Cir., 1941, 118 F.2d 752, 757, the words "final decisions," like the equivalent "final judgments and decrees," have not been understood in a strict and technical sense, but have been given a liberal and reasonable construction. Substance prevails over form. It is evident from a reading of the opinion of the Supreme Court of Puerto Rico that that court considered that it was passing finally and definitely upon all the issues in the litigation. Hence, it would be most unfair to the appellants, and contrary to the spirit and purpose of the stat-

ute conferring upon us jurisdiction to review "final decisions" of the Supreme Court of Puerto Rico, if appellants should be further delayed many months in getting their appeal heard in this court, during which period of delay all that would happen would be that the District Court of San Juan upon remand would inevitably issue its permanent injunction in obedience to the mandate and opinion of the Supreme Court of Puerto Rico, followed by a second appeal to the Supreme Court of Puerto Rico with a . routine affirmance there.

This brings us to the substantive questions considered by the Supreme Court of Puerto Rico. We shall consider first the question of the standing of a taxpayer in Puerto Rico to bring a suit such as this.

The three judges of the Supreme Court of Puerto Rico who sat on this case agreed that this question is of a local nature. They disagreed, however, as to its answer. A majority of them, noting that the authorities were unanimous to the effect that a municipal taxpayer has standing to enjoin the illegal use of municipal funds, that a federal taxpayer has no standing to do the same with respect to federal funds (Commonwealth of Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078), and that there was a split in the authorities where state funds were concerned, were "inclined to accept as more reasonable the rule laid down by the majority of the state jurisdictions, which recognizes the right of the taxpayer to appear in a court of equity to stop the use, without prior legislative authorization therefor, of state funds by executive officers of the state." The majority then went on to say:

"The recognition of that right is needed more in Puerto Rico than in state communities. In the latter, the executive chief or the chiefs of departments, if they act ultra vires or without authorization from the Legislature and make illegal use of public funds, may be submitted to an 'impeachment' proceeding and punished for their illegal act. If in Puerto Rico, the legislature of which lacks authority to bring 'impeachment' proceedings and whose high executive officers do not derive their authority and power from the consent of the governed, we adopted the rule followed by a minority of the state jurisdictions and ignored the fact that the modern tendency is in the direction of acknowledging the right of the taxpayer to sue those who make illegal use of public funds, we would have to admit that in this jurisdiction the illegal act of making unauthorized use of public funds could be committed without there existing an efficient remedy to avoid or punish the same. We would have to confess that in Puerto Rico the legal maxim ubi jus, ibi remedium has no meaning."

The court below therefore held "that petitioner taxpayer has the necessary standing and interest to bring this injunction proceeding." We are asked to reverse this holding on two grounds: First because it is patently erroneous, and second because the question is not a local but a federal one controlled by the decision of the Supreme Court in Commonwealth of Massachusetts v. Mellon, supra. We do not agree.

■ If the question be one of local law we certainly cannot say that the Supreme Court of Puerto Rico fell into manifest error in adopting the rule of a majority of the highest state courts for the reason that that rule was not only supported by the better reason but also was peculiarly appropriate to Puerto Rico. The arguments rather half-heartedly advanced by the defendants in support of reversal on this ground are not of sufficient consequence to warrant discussion.

Their arguments in support of their second ground for reversal on this point cannot, however, be disposed of so summarily. In essence they say that in Commonwealth of Massachusetts v. Mellon the Supreme Court of the United States decided that the constitutional doctrine of separation of powers prevents the courts from interfering at the behest of taxpayers with the action of executive officials, that the doctrine of separation of powers, as a matter of federal law, applies in Puerto Rico, and hence that the Supreme Court of Puerto Rico was not free to select its own rule and erred in refusing to follow the rule established in the case last cited. See also Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374, and Perkins v. Lukens Steel Co., 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108.

■ We concede that the doctrine of separation of powers is implicit in the Organic Act of Puerto Rico as it is in the Philippine Organic Act (Springer v. Government of Philippine Islands, 277 U.S. 189, 201, 48 S.Ct. 480, 72 L.Ed. 845)—we

284

so assumed in deciding Fitzsimmons v. Leon, 1 Cir., 141 F.2d 886—but we do not concede the rest of the defendants' argument.

In Commonwealth of Massachusetts v. Mellon, the Supreme Court decided as a question of first impression that a federal taxpayer's interest in monies in the United States Treasury is shared with so many others, is so comparatively minute and indeterminable, "and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity." [262 U.S. 447, 43 S.Ct. 601, 67 L. Ed. 1078] Then on grounds of public policy it reinforced its conclusion that a federal taxpayer, unlike a municipal one with respect to municipal funds, has no standing to seek an injunction against an alleged illegal expenditure of federal funds, and then said that when no justiciable controversy was before it, the doctrine of separation of powers prevented it from interfering with the action of executive officials on the ground that the statutes under which they were acting were unconstitutional. It said: "We have no power per se to review and annul acts of Congress on the ground that they are unconstitutional." The language of the court in Commonwealth of Massachusetts v. Mellon was directed to a case involving the relation of an individual taxpayer to the Federal Government. The interest of such an individual, as affected by an alleged illegal expenditure of federal funds, was regarded as so minute, indeterminable, and remote, as not to present any substantial case or controversy in the constitutional sense between the plaintiff and the Secretary of the Treasury. But the relation of a taxpayer to the government of Puerto Rico is, as a matter of degree, not so attenuated; and despite any purely logical arguments which might be made from some of the language in Commonwealth of Massachusetts v. Mellon, we have no doubt that it is within the competence of the territorial government, either by legislative act or judicial decision, to authorize a taxpayer's bill in equity in a case like the present without trenching upon the doctrine of separation of powers implicit in the Organic Act. Cf. Crampton v. Zabriskie, 1879, 101 U.S. 601, 609, 25 L.Ed. 1070; Bradfield v. Roberts, 1899, 175 U.S. 291, 20 S.Ct. 121, 44 L.Ed. 168.

Now we come to the question of the interpretation of § 14 of Act No. 16 of 1942, as amended by Act No. 181 of 1943. The Supreme Court of Puerto Rico said that § 14 as it originally read contained two separate and distinct provisions: First, it appropriated once only the specific sum of $10,000,000 out of funds not otherwise appropriated "to be spent within an indeterminate time," and second, it created an additional fund indeterminate in amount and without limitation of time consisting of 70% of the tax on distilled spirits shipped after a given date to the United States. Then the court said that the effect of the amendment was threefold: First, it eliminated the special fund derived from the distilled spirits tax; second, it appropriated the gross sum of $16,000,000 to carry out the purposes of the Act, and third, it provided that the total sum appropriated, or such part of it as the Insular Emergency Council thought necessary, could be spent in any fiscal year until the state of emergency was declared at an end. This last provision, the court said, "was to avoid that the appropriation be considered as a fiscal year appropriation, in which case the remaining funds would revert to the general funds of the Treasury at the expiration of the fiscal year." The court then announced that in its opinion the construction which must be given to the section, as amended, is "that the appropriation is one for the total sum of sixteen million dollars, once only, and to be used totally or partially in any fiscal year, while the state of emergency exists." Next it supported this construction by reference to the proviso that four million dollars of the appropriation should not be available until July 1, 1943, and to the proviso allocating specific amounts to the different features of the relief program, and it concluded its discussion of the point with the statement: "We do not find in the law in force, * * * anything revealing the intention of the legislature to grant to the executive officers who constitute the Insular Emergency Council an authorization to use every year, or every time the previous appropriation is exhausted a new sum of $16,000,000."

The question of the construction of this Act is clearly a local one, but we are nevertheless asked to overturn the Supreme Court of Puerto Rico on the ground that its interpretation is inescapably wrong, and to hold that the appropri-

ation is a continuing one renewed each year by its own terms without the necessity for further legislative action. We are asked to do this on the ground that the Act was so construed by local officers charged with responsibility for the insular finances; on the ground that "such would be the natural inference from the fact that the $16,000,000 provided was somewhat less than the annual cost of the W.P.A. program which it was to replace by 'an ample emergency work program' and other means"; and on the basis of inferences from the wording of the amended section contrary to the inferences drawn by the Supreme Court of Puerto Rico. The answer which we must make is obvious. The construction given to the Act by the court below is reasonable and logical and under such circumstances we cannot say that that construction is inescapably wrong because another construction is possible. In fact, we believe that the interpretation given below is definitely the more reasonable one.

The final question—the question whether under § 34[5] of the Organic Act, 48 U.S.C.A. § 826, the $16,000,000 appropriation is renewed year after year for the duration of the emergency—is a difficult one. The defendants' interpretation that it does so operate is not arbitrary or unreasonable but nevertheless we believe it to be erroneous.

The plaintiff first takes the position that this section is inapplicable here because it applies to renew only the general appropriation bill required by clause 15 of the above section, 48 U.S.C.A. § 834, which reads: "The general appropriation bill shall embrace nothing but appropriations for the ordinary expenses of the executive, legislative, and judicial departments, interest on the public debt, and for public schools. All other appropriations shall be made by separate bills, each embracing but one subject." Then he contends that if this be too narrow a view and § 34 operates to renew appropriations made in the separate appropriation bills provided for, it applies exclusively to bills containing no

substantive provisions but only to ones confined to making appropriations, and then only to bills making annual appropriations, not to ones making "indeterminate no-fiscal year" appropriations like the one here in question. He also denies that an appropriation for emergency relief is one "necessary for the support of the government," within the meaning of § 34. The defendants, on the other hand, contend that under § 34 all bills making appropriations, whether the general one or separate ones, and if the latter, whether or not they also contain substantive provisions, are automatically renewed by § 34, provided the appropriation is "necessary for the support of the government" and provided that a further appropriation is "applicable" to the objects and purposes for which the appropriation had been made in the prior fiscal year, i. e., provided the governmental function for which the appropriation is renewed is a continuing one and operative during the coming fiscal year.

 It seems to us that the use of the plural "appropriation bills" in the part of § 34 quoted in footnote 5 above, and the failure of Congress therein to limit its application specifically to the general appropriation bill only, indicates that it was the intention of Congress that the provision should apply to the separate appropriation bills as well as to the general one. We also concede, for the purposes of this case at least, as did the court below, that the appropriation here was necessary for the support of the government. The general question of what are and what are not appropriation bills within the meaning of the provision, that is, whether it applies only to bills making appropriations and nothing else, or whether it applies to bills containing substantive provisions in addition to appropriating funds to carry out such provisions, and, if the latter, whether classification as an appropriation bill or not should depend upon a judicial determination of a bill's primary and secondary purpose (see Bengzon v. Secretary of Justice and Insular Auditor, 299 U.S. 410, 413, 57 S.Ct. 252, 81 L.Ed. 312), we pass

[5] The applicable provision of this section reads: "If at the termination of any fiscal year the appropriations necessary for the support of the government for the ensuing fiscal year shall not have been made, the several sums appropriated in the last appropriation bills for the objects and purposes therein specified, so far as the same may be applicable, shall be deemed to be reappropriated item by item; and until the legislature shall act in such behalf the treasurer may, with the advice of the governor, make the payments necessary for the purposes aforesaid."

as unnecessary to the decision of this case. We assume for the purpose of this decision that the act in question is an appropriation bill. But § 34 of the Organic Act does not apply to all such bills, even though the appropriation made therein is necessary for the support of the insular government. It applies only to a certain class of them, that is, to those whose objects and purposes will be effectuated by reappropriation, and the Act under consideration as the Supreme Court of Puerto Rico has construed it, is not within that class.

The Supreme Court of Puerto Rico has held in a part of its decision which we have already affirmed that the object and purpose of Act No. 16 is to appropriate the total sum of $16,000,000, once only, for the purpose of relief during the emergency caused by the war whatever the duration of that emergency may prove to be. That is to say, it is established that the purpose and object of the Insular Legislature, in passing the Act was to appropriate a fixed sum and no more to be expended for its emergency relief program regardless of the length of time required for the completion of that program. Under these circumstances it seems to us that reappropriation would not effectuate the legislative object and purpose but would frustrate it by appropriating more than the legislature intended for the purpose it had in mind. In other words, it was the object and purpose of the legislature in passing Act No. 16 to appropriate a lump sum for a specific purpose and reappropriation is inapplicable to this object and purpose because it (reappropriation) would alter the legislative intent by allocating a greater sum to emergency relief than the legislature intended to allocate for that purpose. For instance, and the defendants concede this, an appropriation of $500,000 to build a bridge at a given location would not be renewed by § 34 if at the end of a fiscal year the appropriation was exhausted but the bridge was not quite complete. Obviously it would not be applicable to the purposes and objects of such an act to reappropriate the total estimated cost of the complete structure only to finish it, and this, it seems to us, is precisely the situation before us in the case at bar.

To test appellants' contention as to the applicability of § 34, let us assume that on June 30, 1944, there had remained unexpended $2,000,000 out of the $16,000,000 appropriation. On the first day of the next fiscal year, July 1, 1944, how much would be automatically reappropriated by force of § 34? Would it be $14,000,000? Such a conclusion would seem to be excluded by the terms of § 34, which provides that the sum appropriated in the last appropriation bill (namely, $16,000,000) shall be deemed to be reappropriated. Then would a new sum of $16,000,000 be deemed to be reappropriated on July 1, 1944? This conclusion must be rejected also, because it would give the Emergency Council a sum of $18,000,000 to expend ($2,000,000 unexpended balance of the old appropriation, expendable in any fiscal year, plus the renewed appropriation of $16,000,000). Yet in § 14, as amended, the legislature clearly limited the expenditure for any fiscal year to the sum of $16,000,000. As a third alternative, could it be said that no reappropriation would take place under § 34 until the unexpended balance of $2,000,000 had been exhausted, which might occur, say, on September 1, 1944; and that on that date an automatic reappropriation of $16,000,000 would come into being? And if such were the case, could all of this sum be expended in that fiscal year, making $18,000,000 in all? This third alternative must be rejected because, under the language of § 34, the first day of the new fiscal year is the crucial date on which it is determined whether an automatic renewal takes place—and on that date either the whole of the appropriation in the last appropriation bill is renewed, or none at all. These considerations make it clear, we think, that § 34 by its very terms cannot be applied to a non-fiscal year appropriation of the kind here in question.

We realize that the situation in Puerto Rico is critical, but if a lump sum appropriated for a given purpose proves inadequate to accomplish that purpose, be that purpose to provide relief for the period of emergency caused by the war or to build a bridge, it seems to us, in view of the substantial measure of self-government granted to Puerto Rico by the Organic Act, that only the insular legislature can give relief.

The order of the Supreme Court of Puerto Rico is affirmed.